NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 05a0971n.06
Filed: December 14, 2005

Case No. 03-5055

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| JERRY LAMAR JENKINS, II, | ) | DISTRICT OF TENNESSEE |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |
| _____ | ) | |

BEFORE: KEITH, KENNEDY, and BATCHELDER, Circuit Judges.

ALICE M. BATCHELDER, Circuit Judge. Jerry Lamar Jenkins ("Jenkins") appeals his sentence imposed after a jury convicted him of conspiracy to steal explosives, in violation of 18 U.S.C. §§ 371 and 844(k); stealing explosives, in violation of 18 U.S.C. § 844(k); interstate transportation of a stolen vehicle, in violation of 18 U.S.C. § 2312; carrying an explosive during the commission of a felony, in violation of 18 U.S.C. § 844(h); concealing stolen explosive materials, in violation of 18 U.S.C. § 842(h); and possession of explosives by a felon, in violation of 18 U.S.C. § 842(i)(1). The district court sentenced Jenkins to 501 months in prison and Jenkins filed this timely appeal, challenging his conviction and the calculation of his guideline range under the United States Sentencing Guidelines and the district court's treatment of the guidelines as mandatory. We will affirm Jenkins's conviction, but we must remand this case for re-sentencing under *United States v. Oliver*, 397 F.3d 369 (6th Cir. 2005).

## I. Factual and Procedural Background

Jenkins, Michael Joyner ("Joyner"), Robert Gifford ("Gifford") and Jesse Debter ("Debter") decided to steal explosives from a Wright Brothers Construction Company work site in Tiftonia, Tennessee, on March 26, 2001. The site was entirely fenced and locked with a universal Caterpillar lock. Jenkins and Joyner had Jenkins's 17-year-old girlfriend, Tiffany Langston, drop them off at the site that night. After gaining access to the site and determining that they could not break into the boxes in which the explosives were stored, they called Debter and asked him to help them. Gifford then arrived with a hacksaw, which proved ineffective, so Jenkins and Gifford stole the construction company's pickup truck and drove off, returning eventually with a "jiffy saw" and beer. Using the jiffy saw, the men were able to open the boxes; they loaded the explosives into the truck and drove it across the state line to Jenkins's mother's house in Trenton, Georgia, where they unloaded the explosives into the garage. Jenkins, Joyner, and Gifford then drove the pickup to Jenkins's house in Tiftonia, and Joyner drove the truck to Aetna Mountain and abandoned it.

Over the course of the next two days, the men moved some of the explosives around, burying some in the woods. Jenkins indicated to his co-conspirators that he wanted to "take out" the Dade County Jail and the Hamilton County Jail, as well as the Franklin Building, where the offices for the Bureau of Alcohol, Tobacco and Firearms were located. Joyner later overheard Jenkins tell Langston that Joyner was a liability and that Jenkins would take Joyner out into the woods where Langston could shoot him in the head. Joyner, who believed that Jenkins had shot him once before and had fired a gun in his direction on another occasion, began cooperating with ATF agents and told them where to find the explosives. The agents secured search warrants and seized the explosives.

Jenkins was originally charged in a three-count indictment with receiving, possessing and concealing stolen explosives. A superseding indictment charged Jenkins, Gifford, Debter, and Joyner with the same offenses. Jenkins's three codefendants all pled guilty on December 20, 2001, pursuant to plea agreements. Jenkins at that time made a motion to remove his appointed counsel, and the court, after thoroughly warning him of the consequences of having his motion granted and the perils of representing himself, permitted him to represent himself for the remainder of the hearing with the federal public defender as standby counsel.

On January 8, 2002, the grand jury returned a nine-count second superseding indictment, charging Jenkins with conspiracy to steal explosives from Wright Brothers (Count One); stealing explosives from Wright Brothers (Count Two); interstate transportation of a stolen vehicle (Count Three); carrying an explosive during the commission of a felony (Count Four); concealing stolen explosive materials (Count Five); possession of explosives by a felon (Count Six); possession of a firearm by a felon (Count Seven); threatening to murder a federal law enforcement officer (Count Eight); and attempting to corruptly persuade a witness (Count Nine). This indictment named Jenkins's former co-defendants as unindicted coconspirators. Jenkins again demanded to represent himself, and the district court found that Jenkins understood the disadvantages and his constitutional rights and determined that he wished to proceed *pro se*.

Trial was held March 11-13, 2002. Langston, who was 17 at the time when the crimes were committed, testified that she knew of the men's illegal purposes when she took Jenkins and Joyner to the site and that the day after the theft, when a story about it appeared on the news, Jenkins had told her that he had actually stolen the explosives. Debter and Gifford both testified to their own involvement in the scheme and that Jenkins had been the ringleader. ATF Special Agent Cordell

3

Malone testified that he was the agent assigned to the case and that he executed a search warrant on the Jenkins property in Trenton, Georgia, on August 31, 2001. Malone interviewed Jenkins the same day and Jenkins admitted to being involved in the theft of the explosives and showed Malone where to dig to find the buried explosives. The agents recovered from the Jenkins property 955 12-ounce boosters, 1677 blasting caps, three rolls of "trunk line," and a Caterpillar key. Marty Thomas, an inmate who shared a cell with Jenkins, testified that Jenkins had said that he originally wanted to sell the explosives but later decided to blow up two federal buildings instead. The jury also received as evidence a statement signed by Jenkins in which he admitted to stealing the explosives, transporting the truck across state lines, and hiding the explosives.

The jury found Jenkins not guilty of firearm possession, threatening a law enforcement officer, and attempting to corruptly persuade a witness, and guilty of all of the remaining counts. At sentencing on August 16, 2002, Jenkins objected to the pre-sentence investigation report's recommendations but the district court overruled the objections and found his guideline range to be 444 to 525 months. The court treated the sentencing guidelines as mandatory and imposed a term of 21 months' imprisonment on Count One and consecutive terms of 120 months' each for Counts Two, Three, Four, and Six. The court imposed no sentence for Count Five. Finally, the court ordered restitution to compensate Wright Brothers' insurer because, although the explosives were recovered, they could no longer be used. Jenkins filed this timely appeal.

## II. Conviction on Count IV

Jenkins challenges his conviction on Count IV of the second superseding indictment, which charged him with carrying an explosive during the commission of a felony–specifically, the interstate transportation of a stolen motor vehicle. The statute under which he was convicted, 18

4

U.S.C. § 844(h)(2), states that a person who "carries an explosive during the commission of any felony which may be prosecuted in a court of the United States . . . shall, in addition to the punishment provided for such felony, be sentenced to imprisonment for 10 years." Jenkins argues that the carrying of the explosives that violated this section was "merely incidental" to the underlying crime, which was the theft of the explosives. This argument has two distinct points.

In essence, Jenkins's first point is that he should not be convicted under § 844(h)(2) for carrying the explosives during the commission of another felony because he had to commit the other felony in order to steal the explosives in the first place, and his conviction under § 844(h)(2) therefore constitutes double jeopardy. Jenkins premises this argument on his claim that the predicate felony here is the theft of the explosives. This premise is obviously false, inasmuch as the indictment explicitly charges Jenkins with carrying the explosives during the commission of the offense of interstate transportation of a stolen motor vehicle. Furthermore, Congress has unequivocally stated that punishment under § 844(h)(2) must run consecutively to punishment for the felony in which the explosive was used or carried: ". . . nor shall the term of imprisonment imposed under this subsection run concurrently with any other term of imprisonment including that imposed for the felony in which the explosive was used or carried." 18 U.S.C. § 844(h). Where Congress has shown its clear intent to punish two offenses separately, a defendant's cumulative punishment for the same conduct that violates two statutes does not constitute double jeopardy. *See United States v. Davis*, 306 F.3d 398, 417-18 (6th Cir. 2002).

Jenkins's second point is that Congress did not intend to punish the theft of explosives under § 844(h)(2), because it made the theft itself a specific crime. The intent of this section was to punish the use of explosives to further another crime, he argues, and the government was required to, but

5

did not, show that the explosives were used to *further* the commission of the underlying crime. The circuits differ in the way they interpret the statute.

In *United States v. Rosenberg*, 806 F.2d 1169 (3d Cir. 1986), the defendants were convicted of a violation of § 844(h)(2) for carrying explosives while committing the felony of possessing firearms. *Id.* at 1177. The defendants appealed, claiming that the government had shown no specific connection between the carrying of the explosives and the commission of the felony. *Id.* The court began its examination of the issue by noting that no court had explicitly decided whether the statute requires the government to prove a connection between the carrying of the explosive and the underlying felony. *Id.* (citing *United States v. Lopez*, 586 F.2d 978, 979 (2d Cir. 1978), *United States v. Tiche*, 424 F. Supp. 996, 1000 (W.D. Pa. 1977), *United States v. Pliskow*, 354 F. Supp. 369, 370 (E.D. Mich. 1973)). The legislative history of the section provided only that Congress's intent was to strengthen federal laws regarding the illegal use, possession, and transportation of explosives and that § 844(h) was to carry with it the "stringent provisions of the Gun Control Act of 1968 relating to the use of firearms and the unlawful carrying of firearms to commit, or during the commission of a Federal felony." *Id.* at 1178 (citing H.R. No. 1549, 91st Cong, 2d Sess., *reprinted in* 1970 U.S. Code Cong. & Ad. News 4007, 4046).

Both parties in *Rosenberg* and the court itself therefore looked to 18 U.S.C. § 924(c) in interpreting § 844(h). Before 1984, § 924(c) provided that "[w]hoever . . . uses a firearm to commit any felony . . . or . . . carries a firearm unlawfully during the commission of any felony . . . ." is guilty of an offense. 18 U.S.C. § 924(c) (1983). The section was amended in 1984 to provide that, "[w]hoever, during and in relation to any crime of violence . . . uses or carries a firearm" is guilty of an offense. 18 U.S.C. § 924(c) (1984).

6

The *Rosenberg* court noted that the Ninth Circuit, in *United States v. Steward*, 779 F.2d 538 (9th Cir. 1985), had held that the amendments to this section did not change the meaning of the section and that the "carry" language had always meant "carry in relation to." *Id.* (citing *Steward*, 779 F.2d at 539-40). *Rosenberg* did not find the *Steward* court's rationale persuasive and noted simply that the legislative history was insufficient to support any finding as to why Congress modified § 924(c) in that manner, that Congress did not similarly modify § 844(h), and that "Congress's decision to amend § 924(c), but not § 844(h), is, at best, open to a multiplicity of interpretations." *Id.*

The court then returned to the plain language of § 844(h) and found that the section, "by its terms only requires that the government show that the defendant unlawfully carried an explosive 'during the commission of any felony.'" *Id.* Noting that it was not proper for the court to "declare that the crime defined by § 844(h)(2) has more elements than those enumerated on the face of the statute," the court said that Congress was free "to add a relational element to § 844(h)(2) . . . in the same manner that it added a relational element to § 924(c)," but until it did so, the Third Circuit would "hold that § 844(h)(2) has no relational element." *Id.* at 1179.

The Fifth Circuit, however, in *United States v. Ivy*, 929 F.2d 147 (5th Cir. 1991), said that, although "[a] defendant need not brandish, point, or discharge a weapon to 'carry' or 'use' the weapon," a jury can conclude that the defendant "carried" the weapon for the purposes of § 844 "[i]f the weapon was available to facilitate the crime or if it 'emboldened' a defendant in his offense . . . ." *Id.* at 151. The court then found that the jury verdict was supported because,

> [i]f [the defendant] had needed to terrorize [the victim] further to 'persuade' her to accompany him, the bomb was readily available. [The defendant] knew that [the victim] had been frightened previously by his reference to explosives and could be coerced easily if he chose to display the bomb. The evidence was sufficient to

7

support the jury's conclusion that the bomb facilitated the kidnapping and established an offense under § 844.

*Id.*

In *United States v. King*, 230 F.3d 1364 (Table), 2000 WL 1277815 (8th Cir. 2000), the court first upheld a jury conviction for possessing an illegal firearm and then stated that it also rejected the defendant's "claim that there is insufficient evidence to support his conviction for carrying explosives while committing a felony, for once the jury found that he possessed an illegal firearm, his conviction for carrying explosives followed as of course."

We think that *Rosenberg* and *King* correctly interpret the statute. Because § 844(h) does not contain the "in relation" language that § 924(c) does, but rather defines the offense as "carr[ying] an explosive during the commission of [the] felony," the plain language of the statute does not require a relational element. We therefore affirm Jenkins's conviction on this count.

### III.  Jury Bias

Jenkins argues that he was prejudiced by the district judge's statement to the group of potential jurors prior to selection that Jenkins was representing himself and that he had been warned against doing so, which made him look guilty and as if his defenses were weak. The statement to the jury that Jenkins feels prejudiced him reads:

> THE COURT:  In this case defendant Jerry Jenkins has decided to exercise his constitutional right to represent himself.  Both this Court and United States Magistrate Judge William Carter have advised the defendant of the pitfalls he faces in representing himself.  We have also told him we believe he is making a mistake, and that he would be better off having a trained attorney represent him. Despite our advice, however, defendant is representing himself today.

Because Jenkins did not object to this instruction at trial, we review it for plain error. FED. R. CRIM. P. 52(b); *Johnson v. United States*, 520 U.S. 461, 467 (1997). A plain error is one that "directly

8

leads to a miscarriage of justice," *United States v. Camejo*, 333 F.3d 669, 672 (6th Cir. 2003), and an appellant must show (1) an error, (2) that is plain, (3) that his substantial rights were affected, and (4) that the error seriously affected the fairness, integrity, or public reputation of the judicial proceedings in order to prevail. *Johnson*, 520 U.S. at 467.

Jenkins cites no authority to support his claim that the trial court erred at all in giving this instruction; much less does he show how the instruction affected his substantial rights or affected the fairness, integrity, or public reputation of the judicial proceedings. This assignment of error is wholly meritless.

## IV. Eighth Amendment Claim

Jenkins argues that his 501-month sentence of imprisonment violates the Eighth Amendment's prohibition against cruel and unusual punishment because his co-defendants received sentences of only 18 and 21 months for the same conduct. Jenkins argues that he objected to the court's refusal to grant a downward departure at sentencing and that the court did not recognize that it could depart downward based on the disparity of sentences his co-defendants received.

We reject Jenkins's Eighth Amendment claim. *See United States v. Layne*, 324 F.3d 464, 474 (6th Cir. 2003) (finding no merit to defendant's argument that her sentence offended the Eighth Amendment "merely because it [was] disproportionate to the sentences received by others who committed the same or similar crimes."). And, we have held that *Booker* did not change our consistent rule that a district court's decision not to depart downward from the guideline range is not appealable unless there is a showing that the district court refused to depart under the mistaken belief that it did not have the legal authority to do so. *See United States v. Puckett*, 422 F.3d 340, 345 (6th Cir. 2005). Because it is not clear from the record, however, whether the district court

9

recognized its authority to depart downward, even though the disparity of sentences among defendants is discouraged by the guidelines as a basis for downward departure, and because we must remand this case for resentencing under *Oliver*, we decline to review further Jenkins's claim that the district court erred in refusing to depart downward. The district court will have the opportunity to revisit the issue in light of the now non-mandatory guidelines as well as this circuit's case law. *See, e.g., United States v. Epley*, 52 F.3d 571, 584 (6th Cir. 1995) (refusing to grant a downward departure where there existed a disparity between the defendant's sentence and those of unindicted co-conspirators); *United States v. LaSalle*, 948 F.2d 215, 218 (6th Cir. 1991) (refusing to grant a downward departure to bring the defendant's sentence in line with his co-defendants' sentences).

## V. Remand for Re-Sentencing

In *United States v. Booker*, 125 S. Ct. 738 (2005), the Supreme Court held that the mandatory federal sentencing guidelines violated the Sixth Amendment by requiring judges to enhance the sentences of defendants based on facts not found by a jury or admitted by the defendant. The Sixth Amendment holding of *Booker* is to be applied to all cases on direct review according to ordinary prudential doctrines. *Id.* at 769. Jenkins's sentence was enhanced, pursuant to the mandatory federal sentencing guidelines in place at the time, based on the district court's findings by a preponderance of the evidence that Jenkins had "used" a minor in the commission of the offense, *see* U.S.S.G. § 3B1.4; played a leadership role in the criminal enterprise, *see* U.S.S.G. § 3B1.1(a); obstructed justice, *see* U.S.S.G. § 3C1.1; stolen over 1,000 pounds of explosives, *see* U.S.S.G. § 2K1.3(b)(1)(E); and that the object of stealing the vehicle was to steal explosives, *see* U.S.S.G. § 2B1.1.

In accordance with our precedent, the error of imposing a sentence enhanced by facts not found by the jury is plain, and the prejudice is presumed. *United States v. Oliver*, 397 F.3d 369, 378-80 (6th Cir. 2005). Accordingly, we must remand this case to the district court for re-sentencing, with instructions to treat the sentencing guidelines as advisory.

## VI. Calculation of the Guideline Range

Although the case must be remanded under *Oliver*, in the interests of judicial economy, we will review Jenkins's claims of error in the calculation of his guidelines sentence, because *Booker* instructed sentencing courts to take the guidelines into account when determining a defendant's sentence. *Booker*, 125 S. Ct. at 764. In *United States v. Davidson*, 409 F.3d 304 (6th Cir. 2005), we determined that, based on *Booker*'s instructions, we must review a district court's application of the guidelines in the same way that we did before *Booker* because, although the guidelines are no longer mandatory, they do form a starting point for the district court's determination of the defendant's sentence. *Id.* at 310 (citing *United States v. Scott*, 405 F.3d 615 (7th Cir. 2005); *United States v. Skoczen*, 405 F.3d 537 (7th Cir. 2005); *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005); *United States v. Chriswell*, 401 F.3d 459 (6th Cir. 2005); *United States v. Hughes*, 401 F.3d 540 (4th Cir. 2005)).

We review de novo the district court's interpretations of the sentencing guidelines, and we review its factual findings for clear error. *United States v. Burke*, 345 F.3d 416, 428 (6th Cir. 2003). We must defer to the district court's application of the guidelines to the facts. *United States v. Charles*, 138 F.3d 257, 266 (6th Cir. 1998).

The district court enhanced Jenkins's base offense level by two points for "use" of a minor in the commission of the offense under U.S.S.G. § 3B1.4 based on Langston's driving Jenkins and

11

Joyner to the construction site. Pointing to our statement in *United States v. Butler* that, "[i]n determining whether a defendant 'used or attempted to use' a minor so as to warrant a § 3B1.4 enhancement, a sentencing court should bear in mind that 'used or attempted to use' includes directing, commanding, encouraging, intimidating, counseling, training, procuring, recruiting, or soliciting," 207 F.3d 839, 846 (6th Cir. 2000), Jenkins argues that the government failed to prove that Langston did not freely participate in the offense.

The main issue in *Butler*, however, was whether an enhancement under USSG § 3B1.4 for using a minor in the commission of the crime was proper where the evidence tended to show that the defendant and the minor were partners in the crime but the defendant had not affirmatively encouraged the minor's participation, although another participant may have done so. *Id.* at 849. We stated that "the enhancement should apply when a defendant takes affirmative acts to involve a minor," *id.* at 848, and remanded the case to the district court for re-sentencing because "the district court did not find that [the defendant] directed, commanded, intimidated, counseled, trained, procured, recruited, or solicited [the minor's] participation in the bank robbery." *Id.* at 849.

Jenkins also argues that he could not have "used" Langston in the commission of the offense because she had no idea what he and Joyner would be doing at the site. USSG § 3B1.4, however, "does not impose a knowledge requirement on the minor who is used in the commission of the offense." *United States v. Campbell*, 275 F.3d 1078, 2001 WL 1465462, *2 (Table) (5th Cir. 2001) (citing *United States v. Boudreau*, 250 F.3d 279, 285 (5th Cir. 2001)).

We believe that *Butler* requires the district court to re-examine the use of this particular sentencing enhancement. While it very well may be that Jenkins "used" Langston in the way contemplated by the sentencing guidelines, the district court did not make any findings in that

12

regard, and indeed refused to make any finding as to who procured Langston's participation, stating that it was not "material to the calculation of the guidelines." *See Butler*, 207 F.3d at 848-49.  On remand,  should the district court determine that this enhancement is appropriate, the court should make specific findings with regard to Jenkins's "use" of Langston.

Jenkins has raised several other alleged errors relating to the calculation of his guideline range for sentencing purposes but, after careful consideration of each of those claims, we find no error in those calculations.

## VII.  Restitution

The district court ordered Jenkins to pay $12,720.15 in restitution based on the value of explosives stolen because, although they were recovered, they were no longer usable.  At sentencing and on appeal, Jenkins argues that all of the stolen explosives were returned to the victim in good condition and the victim incurred no monetary loss.  He also noted that the three other co-defendants who had pleaded guilty had also been ordered to make restitution in the same amount, which would result in a windfall to the victim or its insurance company.

We review de novo the issue of whether a restitution order is permitted; we review for abuse of discretion the amount of that restitution.  *United States v. Butler*, 297 F.3d 505, 516 (6th Cir. 2002) (citing *United States v. Comer*, 93 F.3d 1271, 1278 (6th Cir. 1996)); *United States v. Bearden*, 274 F.3d 1031, 1040 (6th Cir. 2001).

Under 18 U.S.C. § 3663A, a sentencing court shall impose restitution as a component of a defendant's sentence, for, among other things, crimes against property.  18 U.S.C. §§ 3663A(a)(1) and (c)(1)(A)(ii).  The statute requires that where the offense has resulted in damage to or loss or destruction of property of a victim of the offense, and the property cannot be returned, the amount

13

of the restitution be the greater of the value of the property on the date of its damage or destruction or the value of the property on the date of sentencing less the value of any part of the property that was returned. 18 U.S.C. § 3663A(b)(1)(B).

Jenkins cites *Butler* for the proposition that the district court cannot adopt the pre-sentence investigation report's recommendation as to the amount of restitution, even if the district court plainly states in its order the amount of restitution to be paid. Jenkins entirely misstates *Butler*'s holding. That case held that the district court may not order restitution in an unspecified amount and delegate to another entity the determination of the amount of restitution to be ordered, but must make that finding explicitly in the restitution order. 297 F.3d at 519 (citing *United States v. Johnson*, 48 F.3d 806, 809 (4th Cir. 1995); *Weinberger v. United States*, 268 F.3d 346, 360 (6th Cir. 2001)).

Here, the district court's sentencing order specifically adopted the factual findings of the pre-sentence investigation report, including the amount of the claim for the explosives paid by the insurance company, specifically ordered restitution in that amount, and specifically ordered that Jenkins would be responsible for restitution only up to the amount of the victim's loss, taking into account the amount paid in by the other defendants. Jenkins did not offer any evidence at sentencing or in his objections to the pre-sentence report that the recovered explosives were still useable, despite their having been buried for several months, or that the value of the explosives was other than the amount of the claim paid by the insurance company. Jenkins's objection is meritless.

## VIII. Pro Se Claims

Jenkins raised four allegations of evidentiary errors or government misconduct in his *pro se* brief to this court. He alleges that the district court improperly admitted the testimony of an expert witness as to the capability of the stolen explosives to do damage, that he was denied access to non-

lawyer friends with whom he wished to confer in the preparation of his case, that he was entrapped because of Joyner's participation in the offense and his subsequent assistance with the prosecution, and that all of the witnesses that testified at his trial were given some sort of benefit by the government in exchange for their testimony. Although we do not ordinarily consider *pro se* claims brought by a defendant represented by counsel on appeal, we have, in an abundance of caution, reviewed them, and we find them to be entirely without merit.

## IX. Conclusion

For the foregoing reasons, we **AFFIRM** Jenkins's conviction in its entirety. We **VACATE** Jenkins's sentence and **REMAND** the case to the district court for re-sentencing.